UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

JUSTIN THOMAS,

                                        Plaintiff,

                    -v-

THE CITY OF NEW YORK, NYPD Detective
CHRISTOPHER WARD, NYPD Officials JOHN
DOE 1 and JOHN DOE 2 (the name "John Doe"
being fictitious, as their true names and ranks are
presently unknown), in their individual capacities,

                                        Defendants.

-----------------------------------------------------------------x

**COMPLAINT AND DEMAND
FOR A JURY TRIAL**

**INDEX NO. 13-CV-_____**

LEVY, M.J.

       Plaintiff JUSTIN THOMAS, through his attorney ROBERT M. QUACKENBUSH of

Rankin & Taylor, PLLC, as and for his complaint, does hereby state and allege:

### PRELIMINARY STATEMENT

1. This is a civil rights action brought to vindicate plaintiff's rights under the First, Fourth and

   Fourteenth Amendments of the Constitution of the United States, through the Civil Rights

   Act of 1871, <u>as amended</u>, codified as 42 U.S.C. § 1983.

2. Plaintiff JUSTIN THOMAS' rights were violated when officials of the NEW YORK CITY

   POLICE DEPARTMENT ("NYPD") unconstitutionally and unlawfully arrested Mr.

   THOMAS and accused him of driving his car the wrong way down a one-way road in front

   of his workplace.

3. However, as Mr. THOMAS' co-workers all know, Mr. THOMAS' car was ***parked*** for

   several hours – ***the entire work day*** – before the officers arrived in the area to find Mr.

   THOMAS eating a post-work meal with a friend in his ***parked*** car after his work shift had

   ended. The car had not been in motion for at least eight hours.

4. When Mr. THOMAS expressed his displeasure with the officers interrupting his meal based upon an obviously bogus justification, the officers arrested him, detained him for approximately 22 hours, and had him charged with no fewer than six separate violations of the law, including several misdemeanors – all of which were dismissed after only two court appearances.

5. By reason of the defendants' actions, including their unlawful arrest and false swearing in the criminal court accusatory instrument, Mr. THOMAS was deprived of his constitutional rights.

6. Mr. THOMAS also seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of the First, Fourth and Fourteenth Amendments to the Constitution of the United States.

8. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) in that Mr. THOMAS' claims arose in the County of Kings, within the confines of this judicial district.

9. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

10. Plaintiff JUSTIN THOMAS is, and was at all times relevant to this action, a resident of the County of Kings in the State of New York.

11. Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department and a department of correction, which act as its agents in the area of law

enforcement, and for which it is ultimately responsible. The CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

12. Defendants NYPD Detective CHRISTOPHER WARD (Shield No. 5165) and NYPD Officials JOHN DOE 1 and JOHN DOE 2 (all three collectively referred to as the "individual defendants") were at all times relevant herein employees or agents of the NYPD. On the afternoon of September 12, 2012, WARD, DOE 1 and DOE 2 were all dressed in plainclothes.

13. Upon information and belief, on September 12, 2012, Det. WARD was assigned to the NYPD's Brooklyn North Narcotics Division.

14. Det. WARD is not a stranger to this Court. Within the past seven years (excluding a period of time he was on military leave outside of New York), Det. WARD has been sued for civil rights violations no fewer than eight times in this Court alone, resulting in settlements totaling no less than $226,000. See, e.g., Whitaker v. City of New York, 11-CV-1546 (JG) (RLM); Dryden v. City of New York, 11-CV-862 (NGG); Colon v. City of New York, 11-CV-173 (MKB) (MDG); Walls v. City of New York, 10-CV-5769 (KAM) (VVP); Mack v. City of New York, 10-CV-3257 (ARR) (MDG); Blackmon v. City of New York, 08-CV-3938 (ARR) (MDG); Lin v. City of New York, 06-CV-5705 (ILG) (CLP); Kitching v. City of New York, 06-CV-364 (RJD) (CLP).

15. The true names and ranks of NYPD Officials DOE 1 and DOE 2 are not currently known to Mr. THOMAS. However, upon information and belief, they were employees or agents of the NYPD on the afternoon of September 12, 2012.

16. Accordingly, both DOE 1 and DOE 2 are entitled to representation in this action by the New York City Law Department ("Law Department") upon their respective requests, pursuant to N.Y. Gen. Mun. L. §50-k.

17. The Law Department, then, is hereby put on notice (a) that Mr. THOMAS intends to name DOE 1 and DOE 2 as defendants in an amended pleading once their true names and ranks become known and (b) that the Law Department should immediately begin preparing their respective defenses in this action.

18. Det. WARD, Official DOE 1 and Official DOE 2 are sued herein in their individual capacities.

## STATEMENT OF FACTS

19. The events herein complained of occurred in front of 646 Junius Street in Brownsville, Brooklyn on September 12, 2012 at approximately 6:00 p.m and thereafter.

20. From approximately August of 2012 until January of 2013, Mr. THOMAS worked for a subcontractor trucking company that moves freight out of New York's John F. Kennedy Airport. In the mornings before work, Mr. THOMAS would park his car in front of an automotive workshop located at 646 Junius Street and leave his keys with other workers at the automotive shop in case they needed to move his car throughout the course of the day. Mr. THOMAS' boss would then drive both himself and Mr. THOMAS to work at Kennedy Airport. At the conclusion of the workday, Mr. THOMAS would typically get his keys from the automotive employees and drive his car home.

21. Consistent with his regular custom, on the morning of September 12, 2012, Mr. THOMAS drove his car to the automotive workshop located at 646 Junius Street and parked it in front

of the building. Mr. THOMAS left his keys with one of the workers at the automotive shop, then his boss drove with him to work at the airport.

22. On his way back to 646 Junius Street at the end of the workday, Mr. THOMAS picked up some food for him and a friend to eat.

23. When Mr. THOMAS got back to 646 Junius Street slightly before 6:00 p.m., he got his keys back from his friend and worker at the automotive shop, Warren Eley. Mr. THOMAS and Mr. Eley then sat down in Mr. THOMAS' parked car and began ravenously eating their post-work meal together.

24. During the entire time Mr. THOMAS and Mr. Eley were in the car eating their meal, the engine to the car remained off. The car never moved. In fact, Mr. THOMAS had not driven his car *since the time he dropped off his car at 646 Junius Street earlier in the morning*.

25. Nevertheless, while Mr. THOMAS and Mr. Eley were eating, one of the individual defendants (in plainclothes) approached the driver-side window and asked Mr. THOMAS, in sum and substance, "HOW'S YA'LL'S EVENING COMING?"

26. Without barely looking up from his meal, Mr. THOMAS responded with words to the effect of, "OK, just eating."

27. Soon thereafter, the two other individual defendants (also in plainclothes) arrived, and one of them ordered Mr. THOMAS to get out of the car.

28. Mr. THOMAS verbally protested but complied with the order and got out of the car.

29. One of the individual defendants then immediately subjected Mr. THOMAS to an invasive search of the interior of his pockets, without Mr. THOMAS' consent.

30. During and after the search, Mr. THOMAS verbally protested the basis for the search and asked the officers why they wanted to search him.

31. One of the individual defendants responded to Mr. THOMAS by saying that "THIS IS A DRUG-PRONE AREA."

32. One of the individual defendants then requested Mr. THOMAS' identification, and Mr. THOMAS complied with the order.

33. During that time, Mr. THOMAS verbally expressed to officers that he was displeased with being stopped simply because the area around 646 Junius Street was a "drug-prone area." In response to Mr. THOMAS' verbal protests of the officers' conduct, the individual defendants began roughing up Mr. THOMAS by shoving him in the chest and ordering him to sit on the trunk of his car.

34. Soon thereafter, the individual defendants placed Mr. THOMAS under arrest on the apparent pretext that Det. WARD allegedly saw Mr. THOMAS driving the car the wrong way on Junius Street that afternoon.

35. Mr. Eley began to verbally protest the illegal nature of Mr. THOMAS' arrest. In response, the individual defendants threatened they would also arrest Mr. Eley if he continued talking. In order to avoid arrest, Mr. Eley stopped speaking.

36. As set forth above, Mr. THOMAS had not driven his car since the beginning of his work day. It remained parked in front of 646 Junius Street from the morning until the time the individual defendants approached Mr. THOMAS' car.

37. After the individual defendants arrested Mr. THOMAS, they placed him into an NYPD vehicle. He was driven around for several hours before being transferred to another NYPD vehicle. Mr. THOMAS eventually arrived at a police station around 11:00 p.m. After processing at the precinct, Mr. THOMAS was brought to Brooklyn Central Booking at around 2:00 a.m. or 3:00 a.m.

38. Unbelievably, when Mr. THOMAS was brought before the criminal court, he was charged with *six* violations of the law: reckless driving (V.T.L. § 1212), driving on the wrong side of the road (V.T.L. § 1120(a)), operation of a vehicle without safety belts (V.T.L. § 1229-C(3)), attempted assault in the third degree (P.L. § 110/120.00(1)), menacing in the third degree (P.L. § 120.15), and resisting arrest (P.L. § 205.30).

39. The factual allegations against Mr. THOMAS were sworn out by NYPD Det. Frank M. Sarrica and were based on the utter falsehoods of Det. CHRISTOPHER WARD. Namely, in relevant part, the criminal court accusatory instrument read as follows:

> Deponent is informed by Detective Christopher Ward Shield No. 5165, of Brooklyn North Narcotics Division, that at the above time and place, which is a public highway, informant observed defendant driving a 1997 Acura, Integra Pennsylvania state license plate no. HZB6865 while stopping at a curb on the wrong side of the street and that informant observed defendant was not wearing a seatbelt.

> Deponent is further informed by informant that, at the above time and place, defendant became irate and defendant stated to informant, what do you want, what the fuck did defendant do, that informant asked defendant to get out of the vehicle and defendant shouted fuck this, this is bullshit, why is informant harassing defendant, that defendant pushed informant in the chest and flailed defendant's arms while shouting, that informant attempted to handcuff and lawfully arrest defendant and defendant held defendant's hands under defendant's armpits to avoid being handcuffed.

> The deponent is further informed by the informant that the above-described action caused informant to fear imminent physical injury and to become alarmed and annoyed.

40. The criminal court released Mr. THOMAS on his own recognizance at approximately 4:00 p.m. on September 13, 2012. Accordingly, Mr. THOMAS was in custody for approximately 22 hours.

41. Despite the seriousness of the allegations against Mr. THOMAS, including the false allegation that he had even ***pushed Det. WARD in the chest***, all of the charges were dismissed when Det. WARD failed to sign a supporting affidavit which would have sworn to the truth of the allegations in the criminal court accusatory instrument.

42. Including Mr. THOMAS' bail hearing, Mr. THOMAS only had to return to criminal court one more time before the prosecutor conceded the case should be dismissed pursuant to New York's speedy trial statute, N.Y. Crim. Pro. L. § 30.30.

**FIRST CLAIM**
**DEPRIVATION OF RIGHTS**
**UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**
***(Against WARD, DOE 1 and DOE 2)***

43. Mr. THOMAS incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

44. Det. WARD fabricated a story that he observed Mr. THOMAS driving on the wrong side of the road, thereby leading at least one of the individual defendants to do an invasive, suspicionless search of the contents of Mr. THOMAS' pockets. When Mr. THOMAS verbally protested the illegal search and the equally-baseless stop and questioning, the individual defendants retaliated against Mr. THOMAS by arresting him and initiating bogus charges against him. All six charges against Mr. THOMAS were dismissed after Det. WARD apparently refused to sign a supporting affidavit which would have sworn to the truth of the allegations in the accusatory instrument.

45. Accordingly, WARD, DOE 1 and DOE 2, under color of state law, subjected Mr. THOMAS to the foregoing acts and omissions, thereby depriving Mr. THOMAS of his rights, privileges and immunities secured by the First, Fourth, and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional

rights: (a) freedom from unreasonable searches and seizures of his person, including but not limited to the initial search of the contents of Mr. THOMAS' pockets, the officers' shoves to Mr. THOMAS' chest, and subsequent false arrest and false imprisonment of Mr. THOMAS, (b) retaliatory arrest, (c) retaliatory prosecution, (d) freedom from the lodging of false charges against him by police officers, (e) freedom from having police officers fabricate evidence against him, and (f) freedom from malicious prosecution by police.

46. WARD, DOE 1 and DOE 2's deprivation of Mr. THOMAS' constitutional rights resulted in the injuries and damages set forth above.

## SECOND CLAIM
## DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983
### (*Against THE CITY OF NEW YORK*)

47. Mr. THOMAS incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

48. All of the acts and omissions by the individual defendants described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence on September 12, 2012 and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the CITY and its agency, the NYPD.

49. The CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

50. The acts complained of were carried out by WARD, DOE 1 and DOE 2 in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

51. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include but are not limited to the following unconstitutional practices:

   a. Arresting persons known to be innocent in order to meet "productivity goals" (i.e., arrest quotas);

   b. Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony

      i. in order to protect other officers; and/or

      ii. in order to meet said productivity goals;

   c. Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

   d. Discouraging police officers from reporting the corrupt or unlawful acts of other police officers; and

   e. Retaliating against officers who report police misconduct.

52. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY and analogous prosecutions of police officers:

   a. People v. Alicea, 00012-2013 (Sup. Ct., N.Y. Co.) (NYPD sergeant indicted for falsely swearing he observed two men engaged in a drug transaction, when video evidence clearly shows that the two arrestees had no contact; in response to the indictment, Manhattan District Attorney Cy Vance stated "We rightfully trust our police officers to report their activities truthfully. Those who do not erode the public's trust in law enforcement... To falsely accuse anyone of a drug sale is not only unacceptable, it is a crime.");

   b. People v. Arbeedy, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testifies that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet their arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests, stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came on to me and I accepted it — being around that so long, and being an undercover"; the

presiding judge, Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naïve regarding the realities of narcotics enforcement. But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed");

c. Schoolcraft v. City of New York, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

d. Long v. City of New York, 09-CV-6099 (AKH) (S.D.N.Y.); People v. Pogan, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records and was prosecuted for recklessly using physical force; the plaintiff was engaged in expressive conduct, to wit, riding in a Critical Mass bicycle ride, when he was assaulted by the officer);

e. Taylor-Mickens v. City of New York, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

f. Colon v. City of New York, 09-CV-0008 (E.D.N.Y.) In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on Iqbal/Twombly grounds, wherein the narcotics officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

g. Bryant v. City of New York, 22011/2007 (Sup. Ct., Kings Co.) (jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);[1]

---

[1] For a description of this case and ultimate settlement, see, Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_

h. Williams v. City of New York, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on the premises);

i. Carmody v. City of New York, 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

j. McMillan v. City of New York, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

k. Avent v. City of New York, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

l. Smith v. City of New York, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

m. Powers v. City of New York, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

n. Dotson v. City of New York, 03-CV-2136 (RMB) (S.D.N.Y.) (officers arrest and use excessive force against a candidate for City Council for trespassing in his own residential building);

o. Nonnemann v. City of New York, 02-CV-10131 (JSR) (AJP), 2004 U.S. Dist. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

p. Richardson v. City of New York, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

q. Barry v. New York City Police Department, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

r. Taylor v. City of New York, 01-CV-5750 (ILG) (MDG) (E.D.N.Y.) (same as Richardson, except without the excessive force; judge at the criminal trial acquitting

Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

s. <u>Walton v. Safir</u>, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo);

t. <u>White-Ruiz v. City of New York</u>, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption"); and

u. <u>Ariza v. City of New York</u>, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department).

53. Furthermore, the existence of the aforesaid unconstitutional customs and policies, **specifically with regard to "productivity goals,"** may be further inferred from the following:

a. Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD commanders are permitted to set "productivity goals."[2]

b. An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is ... summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD Stop, Question and Frisk reports. She added, "The bottom line is everybody's individual activity is being looked at." Later in the recording - made during a roll call in 2010 at Transit District 34 in Coney Island - she said only officers with "good productivity" will get the opportunity to work overtime. She also said Capt. James Sheerin wanted every officer to make at least one arrest per month - up from the previous order of one every three months - because crime had spiked and arrest totals were lower than other transit districts. "He

---

[2]    Jim Hoffer, *NYPD Officer claims pressure to make arrests*, WABC-TV Eyewitness News, March 2, 2010, *available at* http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356 ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

wants everyone to get in the mindset that there's no more collar a quarter," Williams said.[3]

c.  NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officer to make at least "one arrest and twenty summonses" per month. P.O. Polanco's allegations were confirmed by an audiotape obtained by the media. The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss, to wit, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and 20 is breaking your balls, guess what you'll be doing. You're gong (sic) to be doing a lot more, a lot more than what they're saying." The tape also reveals that another patrol supervisor chimed in and told the officers: "Next week, 25 and one, 35 and one, and until you decide to quit this job and go to work at a Pizza Hut, this is what you're going to be doing till (sic) then."[4]

d.  The New York Daily News obtained and published two (2) internal memos which were posted inside the roll-call room at the NYPD's 77th Precinct. The memos specifically instructed officers about "number of tickets to give drivers for cell phone, seat belt, double-parking, bus stop, tinted windows and truck route violations" they were expected to issue. The memos remained posted for several weeks inside the roll-call room until the media began inquiring.[5]

e.  Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas.[6]

f.  In December of 2010 and in response to the pressure from their supervisors to write baseless summonses pursuant to the policy and practice of "quotas," police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As

[3]    Rocco Parascandola, *NYPD Lt. Janice Williams captured on tape pushing for more busts, but brass says there's no quotas*, N.Y. Daily News, March 3, 2011, *available at* http://www.nydailynews.com/ny_local/2011/03/03/2011-03-03_nypd_lt_janice_williams_captured_on_tape_pushing_for_more_busts.html.

[4]    *Id.*

[5]    James Fanelli, Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say, N.Y. Daily News, Nov. 8, 2010, *available at* http://www.nydailynews.com/ny_local/2010/11/08/2010-11-08_cops_told_to_meet_quotas.html.

[6]    Tom Namako and Kirsten Fleming, *Nighttime Riders in Big Sit Fit*, The New York Post, December 26, 2009, *available at* http://www.nypost.com/p/news/local/space_hogs_lapped_on_empty_subways_m7iRAd9b4E9alYPuGvy5OO.

one (1) officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[7]

g. In response to the planned summons-boycott at the 79th Precinct, on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a deputy inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying. "I'll come down here and make sure you write them." Marino also vowed to transfer people, like he did when he was the commanding officer of the 75th Precinct in East New York.[8]

h. Capt. Alex Perez, the second in command at the NYPD's 81st Precinct, testified in a civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor performance ratings if they have few arrests, conceding that that arrest numbers are a factor in evaluating an officer's performance.[9] Ultimately, the jury in that case ruled that the police had a policy "regarding the number of arrests officers were to make that violated plaintiff's constitutional rights and contributed to her arrest."[10]

i. The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four (4) parking tickets, three (3) moving violation citations, three (3) "quality-of-life" summonses, make one (1) arrest and two (2) stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.[11]

j. Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to The New York Daily News:

[7]     Rocco Parascandola, *Irate cops at 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas*, N.Y. Daily News, Dec. 12, 2010, *available at* http://www.nydailynews.com/news/ny_crime/2010/12/12/2010-12-12_bklyn_cops_threaten_tixwriting_boycott.html#ixzz180Q0JW7t.

[8]     Rocco Parascandola, *Deputy Chief Michael Marino threatens cops at the 79th Precinct who want to go on summons strike*, N.Y. Daily News, Dec. 15, 2010, *available at* http://www.nydailynews.com/ny_local/2010/12/15/2010-12-15_summons_strike_i_dare_ya_deputy.html.

[9]     William J. Gorta, *Brooklyn Mom's Suit Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15, 2011, at 6, available on Westlaw at 2011 WLNR 2986205; see also Oren Yaniv, *Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb. 15, 2011, at 20, also available on Westlaw at 2011 WLNR 2986205.

[10]     Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_quotas_woman_injured_in_2006_arrest_settles_for_750.html.

[11]     *New York City Ticket Quota Confirmed, Denied*, The Newspaper.Com, January 21, 2006, *available at* http://www.thenewspaper.com/news/09/914.asp; *see also*, Kirsten Cole, *NYPD's Bogus Little Secret: Parking Ticket Quotas -- Agents Often Caught Citing You For Violations You Didn't Commit*, WCBSTV.com, August 14, 2007, *available at* http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html (referring to the arbitrator's report).

The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.

"You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.

Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.

Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.

Unbeknownst to Creighton, one officer had his NYPD radio switched on - so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[12]

54. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, <u>inter alia</u>, by the following:

a. Despite being on notice of defendant Det. WARD's propensities to violate civilians' constitutional rights, the CITY has not adequately disciplined or remedially-trained defendant Det. WARD in his constitutional duties as a police officer. Specifically, defendant Det. WARD has been sued at least eight (8) times in this Court for violations of various plaintiffs' constitutional rights, resulting in settlements totaling at least $226,000.00 within the past seven (7) years, a period of time which even includes Det. WARD's military leave away from the NYPD. Specifically, defendant CITY's failure to remedially train and/or adequately discipline Det. WARD is evidenced by the following federal actions brought against him in this Court:

   i. <u>Whitaker v. City of New York</u>, 11-CV-1546 (JG) (RLM) (E.D.N.Y.) (Det. WARD illegally diverted the prisoner van he was driving (which contained a grandfather who was illegally arrested for an alleged hand-to-hand drug transaction in front of his granddaughter) from precinct to precinct when it was clear that the grandfather was experiencing the early signs of cardiac distress; case settled before trial for $36,000)

---

[12] Allison Gendar, *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, *available at* http://www.nydailynews.com/news/ny_crime/2007/11/14/2007-11-14_nypd_captain_allegedly_caught_in_arrest_-1.html#ixzz0bfPBhRTz.

ii. <u>Dryden v. City of New York</u>, 11-CV-862 (NGG) (E.D.N.Y.) (Det. WARD and other officers illegally enter plaintiffs' home, conduct an illegal search, and arrest occupants upon trumped-up, false allegations of marijuana consumption; case settled before trial for $30,000);

iii. <u>Colon v. City of New York</u>, 11-CV-173 (MKB)(MDG) (E.D.N.Y.) (plaintiffs allege Det. WARD acted in concert with other officers to frame two men for gun possession; summary judgment motion currently pending);

iv. <u>Walls v. City of New York</u>, 10-CV-5769 (KAM) (VVP) (E.D.N.Y.) (Det. WARD and other officers illegally enter plaintiff's apartment and conduct search; when no contraband is recovered, Det. WARD and others make an illegal arrest and initiate bogus drug charges, which were summarily dismissed; case settled before trial for an undisclosed sum);

v. <u>Mack v. City of New York</u>, 10-CV-3257 (ARR) (MDG) (Det. WARD and other officers illegally break down door to plaintiff's apartment and conduct search of apartment, finding no contraband; Det. WARD and other then arrest plaintiff after he verbally complained about the illegal search; case settled before trial for $16,000);

vi. <u>Blackmon v. City of New York</u>, 08-CV-3938 (ARR) (MDG) (E.D.N.Y.) (Det. WARD and other narcotics officers are alleged to have conducted illegal entry to a home, arrested innocent occupants; case settled before trial for $56,500);

vii. <u>Lin v. City of New York</u>, 06-CV-5705 (ILG) (CLP) (E.D.N.Y.) (Det. WARD and other officers alleged to beat plaintiff and his infant-son inside the father's place of business and subsequently have both of them arrested; case settled before trial for $72,500); and

viii. <u>Kitching v. City of New York</u>, 06-CV-364 (RJD) (CLP) (E.D.N.Y.) (Det. WARD and other officers illegally enter plaintiffs' homes, conduct an illegal search; case settled before trial for $15,000).

b. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such

taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[13]

c. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

d. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in <u>Colon v. City of New York</u>, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread... custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, NYPD Commissioner Raymond Kelly acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[14]

e. Regarding the CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[15] When it does, however, Commissioner Kelly controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during Kelly's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (<u>i.e.</u>, closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[16] As a result, the percentage of cases where

---

[13]     Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/ 4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[14]     Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[15]     In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%). *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted <u>de facto</u> policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, <u>inter alia</u>, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[16]     Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[17]

55. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, inter alia, by the following:

a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[18]

> [...]

> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[19]

---

[17] Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

[18] Mollen Commission Report, p. 36.

[19] Mollen Commission Report, pp. 40-41.

b. In June of 2011, in the case in New York County Supreme Court entitled <u>People v. William Eiseman</u> (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[20]

c. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[21] Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

> That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

> Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[22]

---

[20]    Melissa Grace, *NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal*, N.Y. Daily News, June 27, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/06/27/2011-06-27_nypd_ sgt_william_eiseman_pleads_guilty_to_lying_under_oath_in_plea_deal.html.

[21]    Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

[22]    *Id.*

d. In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[23]

e. In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.
>
> [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.
>
> Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.
>
> To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…
>
> [P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.
>
> "There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[24]

---

[23]    John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/2008-06-20_claims_of_corruption_at_queens_precinct_.html.

[24]    Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at* http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[25]

    f. In early 2010, the CITY settled a civil rights lawsuit wherein one Officer Sean Spencer[26] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000. In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[27]

    g. Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[28]

56. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, inter alia, by the following:

    a. Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

---

[25]     John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/ 2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[26]     In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, available at http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_ out_35g_to_granny_busted_as_hooker.html.

[27]     *Id.*

[28]     David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

b. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

c. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

57. The existence of the above-described unlawful de facto policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including without limitation Commissioner Kelly.

58. The actions of the individual police defendants resulted from and were taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

59. All of the foregoing acts by defendants deprived Mr. THOMAS of federally protected rights, including but limited to the constitutional rights enumerated in paragraph "45" above.

60. The CITY knew or should have known that the acts alleged herein would deprive Mr. THOMAS of his rights, in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution.

61. The CITY is directly liable and responsible for the acts of WARD, DOE 1 and DOE 2 because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

62. Despite knowledge of such unlawful de facto policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner Kelly, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

63. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein, both as to Mr. THOMAS specifically and as to all of the

plaintiffs who have previously sued Det. WARD for civil rights violations generally (see ¶¶ 14, 54(a) above).

64. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, WARD, DOE 1, and DOE 2 felt empowered to arrest Mr. THOMAS without probable cause and then fabricate and swear to a false story to cover up their blatant violations of Mr. THOMAS' constitutional rights.

65. Indeed, in light of the raft of federal lawsuits against Det. WARD and the unbelievable amount of money he is responsible for draining from the public coffers to settle those lawsuits, the fact that the NYPD has seen fit to continue sending Det. WARD into the street to interact with civilians highlights the CITY's deliberate indifference to innocent civilians such as Mr. THOMAS.

66. Mr. THOMAS' injuries were a direct and proximate result of the CITY and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the CITY and the NYPD to properly supervise, train and discipline their police officers, such as WARD, DOE 1 and DOE 2.

**JURY DEMAND**

67. Mr. THOMAS demands a trial by jury in this action on each and every one of his damage claims.

**WHEREFORE**, plaintiff JUSTIN THOMAS demands judgment against the defendants individually and jointly and prays for relief as follows:

a. That he be compensated for violation of his constitutional and common law rights, pain, and suffering; and

b. That he be awarded punitive damages against all defendants besides than THE CITY OF NEW YORK; and

c.   That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d.   For such other further and different relief as the Court may seem just and proper.

Dated:   New York, New York
         April 5, 2013

                              Respectfully submitted,

By:   _____

      Robert M. Quackenbush
      Rankin & Taylor, PLLC
      *Attorneys for the Plaintiff*
      11 Park Place, Suite 914
      New York, New York 10007
      t: 212-226-4507